**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| **MCLEAN MORTGAGE CORPORATION,** ) | Case No. |
| ) | |
| Plaintiff, ) | **COMPLAINT FOR DAMAGES AND** |
| ) | **DECLARATORY RELIEF** |
| **v.** ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| **JAMES NADER,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT

Plaintiff McLean Mortgage Corporation ("MMC" or the "Company") brings this

Complaint against Defendant James Nader ("Nader"), and in support alleges as follows:

### INTRODUCTION

1.      This is a disturbing case involving a rogue Chief Executive Officer's ("CEO's")

brazen and programmatic violations of his fiduciary duties and obligations.  MMC, its non-

executive Board members, and its shareholders have recently learned that the Company's former

CEO, James Nader, for years pursued a range of self-interested transactions designed solely to

enrich himself at the Company's expense – all while misleading the Company's Board and

employees, and otherwise keeping these important constituencies in the dark.  The full range of

Nader's misconduct – as well as the extensive harm it has caused the Company – is only now

coming fully into view.

2.      MMC is a family-owned, "client-first" focused mortgage lender based in Fairfax,

Virginia.  *See* https://mcleanmortgage.com/about/ (last visited September 7, 2022).  Since its

founding in 2008 with an initial $10 million capitalization by Delmar Lewis, MMC has provided mortgage services and advice to over 57,000 families, making MMC one of the most trusted community mortgage lenders in the area.

3.      In early 2019, the continued operations and legacy of MMC were entrusted to its newly-appointed CEO, James Nader, who reported to MMC's Board.

4.      Despite ongoing negotiations before Nader's appointment through 2022 between MMC and Nader concerning the terms of Nader's proposed employment agreement, no such agreement was ever reached or executed because Nader would not execute the agreement unless MMC agreed to terms that would, among other things, ratify his then-unknown egregious misconduct.

5.      Nader, like all Virginia corporate officers and directors, owed fiduciary duties to MMC and its shareholders.

6.      From the day he became CEO, Nader used his position to engage in a series of self-interested and self-dealing activities for the sole purpose of enriching himself.  During this entire time, he completely and flagrantly disregarded his fiduciary duties solely to promote a hidden scheme to manipulate and mislead the MMC Board and its shareholders into allowing Nader to gain ownership and control of MMC, and to enrich himself at the expense of MMC and its employees.

7.      *First*, Nader worked to acquire stock of MMC from other minority shareholders under the guise that the stock would be repurchased by MMC.  In fact, and without the knowledge and consent of the Board, Nader purported to purchase these shares for himself using MMC funds and by taking loans from MMC to pay for these shares without any Board disclosure or authorization.

8.      *Second*, without the Board's knowledge or approval, Nader created a limited liability company, Virtual Title & Equity, LLC ("VTE").  Although MMC – again, without the Board's knowledge – provided the funds to create VTE, MMC was issued less than 50% of its equity, while Nader ensured that he would be in control of VTE.  Nader then authorized a $400,000 line of credit from MMC to VTE.  VTE currently owes $400,000 against that line of credit, plus an additional $120,000 in expenses, for a total of $520,000.  Nader used MMC funds to establish VTE bank accounts, credit lines, and marketing materials, and to acquire other title companies for VTE.

9.      While the MMC Board was unaware of VTE's existence or that it was funded using MMC's capital, Nader instructed MMC loan officers to refer business to VTE for the purpose of enriching himself on the back of MMC's assets, business, and goodwill.

10.      Once the MMC Board learned of VTE's existence, Nader hatched a plan to divest MMC of its ownership shares so he alone could control and profit from VTE.

11.      *Third*, Nader intentionally disrupted and sabotaged the sale of MMC in an attempt to acquire the Company himself at a steep discount.  Nader knew the Board sought to sell the Company to a buyer best suited to ensure the Company's long term success, and during this same time, Nader sought to purchase MMC for well below market value.  But the Board rejected Nader's offer, and subsequently received multiple offers to buy MMC for many times more than Nader's lowball offer.

12.      Despite his duty to work in the best interest of the Company and its shareholders, Nader worked to sabotage a sale to those bidders.  He intentionally leaked information about the deal to MMC employees to stoke hostility towards the buyer and the sale.  He also moved to assemble competing bid proposals that would benefit him financially (at MMC's expense).

13.     Toward the end of his tenure with the Company, Nader also sought to shore up his own position in MMC and protect his own self-interest by offering employment agreements to certain loan officers that allowed them to leave without repaying their substantial signing bonuses (up to $2 million) if Nader were no longer employed by the Company.

14.     Nader further entered into agreements that were critical to the Company's operation and contingent upon him remaining in control of MMC, in an attempt to cause irreparable harm to MMC if he were fired.  As an example, he asserted his dismissal would put the Company at risk of violating bank covenants, and falsely alleged that this violation would cause the Company to fail.

15.     As a result of Nader's efforts, the potential sales of MMC fell through, causing MMC (and its shareholders) substantial harm.

16.     Once Nader's machinations finally came to light, the Board promptly terminated him and began a full investigation of his conduct.  Based on what it has learned so far, it is clear that Nader has caused the Company substantial damages through serious misconduct.

17.     MMC now brings this suit to recover those damages, as well as all other appropriate relief, including declaratory relief and attorney's fees and costs.

## **PARTIES**

18.     Plaintiff McLean Mortgage Corporation is a corporation organized under the laws of the Commonwealth of Virginia, located at 11325 Random Hills Road, Suite 400, Fairfax, Virginia 22030.  It is a local and trusted community mortgage lender, providing mortgage services and advice to over 57,000 families since its opening in 2008.

19.     Defendant James Nader is the former CEO of MMC.

## JURISDICTION AND VENUE

20.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332 because there is complete diversity between the parties.

21.     MMC is a citizen of the Commonwealth of Virginia for diversity jurisdiction purposes.  A corporation is "deemed to be a citizen of every State" where it is incorporated and where it "has its principal place of business."  28 U.S.C. § 1332(c)(1).

22.     MMC is a citizen of the Commonwealth of Virginia because it is incorporated in Virginia and has its principal place of business there.  *See id.*

23.     Nader is a citizen of the State of Maryland and domiciled at 5509 Westbard Avenue, Bethesda, MD 20816.

24.     Complete diversity therefore exists between the parties.

25.     The amount in controversy also far exceeds the sum or value of $75,000.  *See* 28 U.S.C. § 1332(a).  Nader's flagrant violations of his fiduciary duties and responsibilities, including but not limited to fraudulently acquiring company equity and misusing corporate assets, and actively hiding his activities from the Board, have caused MMC damages that far exceed the jurisdictional minimum.

26.     The Company has had to undertake a costly investigation to uncover the full range of his misconduct.

27.     Counteracting his misconduct will also involve substantial time and expense.

28.     Nader's self-interested transactions involving VTE involved the misuse of substantial corporate funds.

29.     Nader also misused substantial corporate funds in a purported effort to acquire an ownership interest in MMC.

30.     And Nader's failure to cooperate in and efforts affirmatively to sabotage the sale of MMC have cost MMC millions of dollars.

31.     The Court has personal jurisdiction over MMC because it transacts business in the Commonwealth.  *See* Va. Code Ann. § 8.01-328.1(A)(1).

32.     The Court has personal jurisdiction over Nader because he substantially injured MMC through his actions and omissions in Virginia and transacted business in Virginia as MMC's CEO.  *See id.*§ 8.01-328.1(A)(1) and (3).

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to MMC's claims against Nader occurred in this District.  Nader breached his fiduciary duties and engaged in a bevy of corporate misconduct in this District.  *Id.*

## FACTUAL ALLEGATIONS

### *MMC Appointed James Nader As CEO*

34.     MMC was founded in 2008 with the goal of building a strong financial institution that would become a trusted partner for families hoping to find the right homes and the right financing.

35.     Over the years, MMC grew to become one of the top mortgage lenders in the area.  MMC operated on a "clients first" ethos, employed a team of accomplished and motivated mortgage professionals, and has helped many families achieve their dreams of home ownership.

36.     MMC is a closely-held family business.  In the early years following MMC's founding, the Company's founder, Delmar Lewis, served as Chairman of the Board and delegated most of the day-to-day operating responsibilities to the Company's former CEOs, Nathan Burch and Pat Peavley.

37.    Delmar's sons, Christopher and Brendan Lewis, became members of MMC's Board of Directors in 2019 and 2020, respectively, with the goal of safeguarding the Company's overall health and legacy.  Delmar Lewis served as Chairman of the Board.

38.    Christopher, Brendan, and Delmar Lewis (now through his trust) are shareholders of MMC.

39.    In 2010, James Nader joined MMC in a Vice President role.

40.    In early 2019, the Board promoted James Nader to CEO.

41.    MMC and James Nader's relationship was intended to be governed by an employment agreement, which was initially drafted in 2018.

42.    In January 2019, Nader received an updated draft of his proposed employment agreement, which outlined his role and compensation package.

43.    At the time, the proposed agreement only allowed Nader to acquire equity in MMC through a proposed grant of stock options that would vest over time.  (But that soon changed without the Board's knowledge.)

44.    Despite months of negotiations over the terms of the proposed employment agreement and the possibility of an option grant, the parties never finalized and executed an agreement.

45.    Nevertheless, in April 2019, the Board passed a resolution that, effective as of January 2019, Nader would be formally appointed as the President, CEO, and Secretary of MMC.

46.    The Board still worked in good faith to execute a formal employment agreement with Nader, assuming terms could be finalized and agreed between Nader and the Company.

47.     After becoming CEO, and for the next three and a half years, Nader engaged in a broad range of self-interested schemes designed to enrich himself at the Company's expense.

### Nader Misappropriated Company Funds In An Effort To Acquire MMC Shares For Himself Without Any Board Approval

48.     In September 2019, Karen Lewis, a shareholder and employee of the Company owning 10% of MMC's equity, contacted Nader to inquire about selling 5% of her MMC shares to MMC investors in exchange for installment payments.

49.     Nader, without the Board's knowledge or consent, advised Karen Lewis that he would like to buy the shares "back into the company" for the purpose of distributing them to MMC executives.

50.     Nader then advised the Board, contrary to his statements to Karen Lewis, that Karen Lewis's shares would be purchased by MMC and put back into MMC's Treasury Fund. That representation was false.

51.     Instead of the shares being returned to MMC and put in the MMC Treasury Fund for possible later distribution to MMC employees on terms approved by the Board, Nader purported to purchase the shares using MMC funds and then transfer the shares to himself.

52.     To obtain the shares, Nader directed MMC to forgive debt Karen Lewis owed the Company and to pay Karen Lewis cash for the shares.  Nader and Karen then completed the stock transfer.  After the transfer, Nader signed a promissory note to repay the Company for the funds paid by MMC for Karen Lewis's shares.

53.     Nader did not actually create the promissory note until several months after he directed the Company to take that action, without Board knowledge or approval.  He alone dictated the terms of the promissory note, including automatic forgiveness of the note over three

years, subject only to his continued employment by MMC.  Nader alone then signed the promissory note without Board knowledge or approval.

54.     While Nader and MMC were still negotiating a possible employment agreement at this time, the draft employment agreement did not afford Nader any option to acquire equity from existing MMC shareholders nor mention any intent of doing so.  Nor did the Board ever authorize Nader to purchase Karen Lewis's shares (or any other shares) for himself – as manifestly evidenced by his improper signing of the note for the borrower and the lender.

55.     Nevertheless, in October 2019, Nader altered his draft employment agreement to rationalize and accommodate his improper behavior and purported purchase of the shares after the fact.  The new draft contained provisions authorizing Nader to purchase company equity.  It further proposed to authorize Nader to borrow MMC company funds to finance his purchases of company shares.

56.     These changes to Nader's draft employment agreement were neither shared with nor agreed to by MMC's Board.

57.     Following these changes, and while actively keeping the Board in the dark, Nader opportunistically used MMC company funds to purchase the shares for roughly half their fair market value, disbursing company funds from September 2019 through July 2020 to Karen Lewis in small increments ranging from $5,000 to $25,000, purportedly to hide the true use of these funds.

58.     The Board never authorized Nader to use MMC funds to purchase Karen Lewis's shares for himself.

59.     In January 2020, Karen Lewis requested a purchase agreement for the sale of her shares.  In July 2020, after the disbursements were completed, Nader promised to provide Karen Lewis with a purchase agreement.

60.     The purchase agreement was never seen or authorized by the Board.

61.     Based on Nader's false representations, the Board believed that Karen Lewis's shares had been transferred into the MMC Treasury Fund following the purchase of her shares. But that never happened.

62.     In November 2020, Nader presented the Chairman of the MMC Board, Delmar Lewis, with the proposed new terms of his draft employment agreement.  Specifically, the proposed agreement's new equity-related provisions purported to allow Nader to purchase up to 25% of MMC shares from minority shareholders or acquire newly-issued shares.

63.     The Board never approved the changes to the draft employment agreement or agreed to them, and told Nader it would not approve the changes.

64.     Thus, MMC and Nader never finalized and executed any employment agreement, nor approved or authorized Nader's acquisition of MMC shares.

65.     Nevertheless, Nader continued to purchase MMC shares from minority shareholders by directing MMC funds for his own benefit and without authorization from the Board.

66.     In or around November 2020, Karen Lewis contacted Nader again to inquire about selling her remaining MMC shares to Nader or MMC.

67.     On December 31, 2020, a second purchase agreement was executed for the direct sale of Karen Lewis's shares to Nader.  Nader signed the purchase agreement for both the purchaser (himself) and the Company.  As with the first purchase of Karen Lewis's shares,

Nader issued to the Company, and directed the Company to accept, a promissory note for the purchase price payable to her.  Nader alone dictated the terms of the promissory note, including automatic forgiveness of the note over three years, subject only to his continued employment by MMC, and he alone signed the note.

68.     While the Board was aware that Karen Lewis's shares were being acquired, the Board believed these shares were being returned to the MMC Treasury fund and was never made aware of the transaction's benefits to Nader.

69.     During the same month, Nader directed the negotiation of the sale of the MMC shares of the late minority shareholder, Pat Peavley, represented by an MMC Loan Officer, Larry Justice.  Justice is the executor of the Peavley estate.  Nader proposed that MMC would purchase the Peavley Estate's shares, which amounted to approximately 10% of MMC's outstanding shares.

70.     In January 2021, Justice rejected the offer to purchase the Peavley Estate's shares after Nader refused to give him a fair evaluation of the fair market value of his shares.  The Board believed the discussions between Nader and Justice related to purchasing the shares for the MMC Treasury Fund, not for Nader's personal gain.

71.     Later, Justice made a lawful shareholder demand for financial information, to which Nader failed to respond.

72.     On information and belief, Nader again planned to pay for the Peavley Estate's shares with MMC funds while transferring the shares to Nader.

73.     On April 6, 2021, MMC's Board learned that Nader had been purchasing and attempting to purchase the equity of minority shareholders for himself using MMC funds for his own benefit, rather than for the MMC Treasury Fund.

74.     Consequently, the Board halted the discussions surrounding Nader's draft employment agreement, even though it had already paid Nader a good faith bonus in 2020 in advance of the employment agreement being executed.

75.     In response, Nader unilaterally canceled an upcoming shareholder's meeting in violation of the Company's bylaws without informing the full Board.

76.     Despite the Board's discovery, Nader attempted to acquire another 5% of MMC stock in 2022 when he requested control over the 5% of MMC shares that were held in the MMC Treasury Fund.

77.     Nader of course offered no payment for these shares, but rather requested the Board give him the shares for free.

78.     The Board never approved Nader's brazen request.

### Nader Formed Another Business – In Which He Owns A Majority Interest – Using MMC Funds

79.     Not only did Nader use MMC funds to finance his purchases of MMC shares, but he also used MMC funds to finance the formation of another business vehicle for his benefit.

80.     In September 2020, Nader created a business called VTE without Board approval or communication.  VTE offered a range of services, including title insurance.

81.     VTE was established as a Virginia limited liability company ("LLC") in November 2020.

82.     Under the terms of the LLC agreement, Nader controlled the voting interest in VTE.  He planned eventually to eliminate MMC's interest.

83.     After creating VTE, Nader used MMC funds to establish VTE's presence in the marketplace, including opening a line of credit from MMC to VTE that he used to fund VTE.

84.     Nader also opened and funded bank accounts, took out credit lines, purchased title companies, and created marketing materials and a website for VTE – all paid for with funds from MMC and using MMC staff and facilities.

85.     Despite controlling VTE, Nader did not contribute material funds to form or fund the operations of VTE.  MMC effectively funded the entire operation without the Board's knowledge or approval and yet MMC only retained a 48% membership interest.

86.     Nader then used his executive authority at MMC to vacate one of MMC's subleases to give the leased space over to VTE for its offices.  Nader later renewed that sublease for VTE without the authorization of the Board.

87.     By March of 2021, VTE, through Nader, had hired employees and developed a business plan.  That plan included the acquisition of other companies, and indeed, VTE acquired another title company using funds from MMC.

88.     Nader never informed the Board of the fact or circumstances of VTE's formation, the use of MMC funds by VTE, nor the acquisition of other companies by VTE.

89.     But at the same time he kept the Board in the dark, Nader informed MMC loan officers and staff of VTE's existence and operations for the purpose of encouraging them to refer settlement and title service business opportunities to VTE on an ongoing basis.

90.     As a result, VTE was not only funded by MMC, but its early growth was largely dependent on business opportunities referred from MMC by way of Nader's authority and encouragement.

91.     In May 2021, once VTE was established using MMC's funds and referrals, Nader notified the Board of VTE's existence and MMC's membership in the LLC.  However, the Board was never informed that MMC had been funding VTE's operations up until that point.

92.     Shortly thereafter, Nader began working to take complete control of VTE by diluting MMC's interest in it.

93.     In September 2021, Nader began suggesting directly to the MMC Board that MMC divest itself of VTE, all the while intending to keep VTE's operations going for his own benefit.

94.     Nader told the Board that MMC should avoid having any equity interest or formal association with VTE because MMC's investment in the company's creation was a mistake.

95.     This representation was false.  Nader only wanted MMC to divest its interest in VTE so that he could retain complete control over the entity that MMC funded.

96.     Nader then used his powers as CEO of MMC to keep MMC and VTE from becoming further intertwined in any way that could frustrate his plan to dilute MMC's interest in VTE.  He avoided having VTE formally associated with MMC in any business-related ventures.

97.     For example, Nader declined to approve an MMC-VTE cross-company guarantee for printer leases, stating as his reason that MMC would be divested from VTE in the near future.

98.     Despite wanting to divest MMC of any equity or voting power it had over VTE, Nader continued to use MMC resources to further VTE's growth.

99.     In February 2022, Nader produced a "commercial" advocating the use of VTE's services.  The promotion was targeted to MMC loan offers, encouraging them to refer more business to VTE.  On information and belief, Nader used MMC funds, facilities, and staff to finance this commercial.

100.    Ultimately, Nader sought to develop VTE using MMC resources so that it could refer business opportunities (and revenue) to VTE.  By doing so, the value of Nader's interests in VTE would increase without MMC retaining any benefit from VTE.

### *Nader Sabotaged The Potential Sale Of MMC In An Effort To Acquire MMC For Himself*

101.    On July 12, 2021, Nader tendered a low-ball offer to buy MMC purportedly with capital raised from outside investors.  Nader offered to purchase all the equity held by the Lewis family members, which would result in Nader becoming the majority shareholder of MMC.

102.    On information and belief, and in violation of his fiduciary duties, Nader provided confidential information to outside investors to incentivize them to back his unauthorized and self-interested bid for the Company.

103.    The Board declined to accept the offer because Nader's price was far below even book value, let alone fair market value.

104.    Following Nader's offer and the death of the Board's Chairman, Delmar Lewis, MMC's Board convened a special committee to determine MMC's fair market value and consider MMC's potential options for sale.

105.    From the fall of 2021 to early 2022, MMC considered interest from potential buyers for an acquisition of MMC.

106.    During this time, Nader and the MMC Board renewed the negotiations surrounding Nader's draft employment agreement and the terms of his compensation.

107.    Nader was aware the Board sought to sell the Company, as the Board informed him that "the prize right now is successfully selling the company" and that Nader's compensation "should be directly tied to that."

108.    In June of 2022, Nader's draft employment agreement even contained explicit provisions linking Nader's compensation as CEO to a successful sale of MMC.

109.    The Board and Nader did not finalize or execute the draft agreement.  Rather, the parties decided to refrain from signing the employment agreement until a purchase agreement for the sale of MMC was signed.

110.    During these months of negotiations, and without the Board's knowledge, Nader was also working on a plan to acquire MMC himself.

111.    In September 2021, while the Board was fielding substantial offers for MMC, Nader, with the help of MMC's auditor, Richey May & Company, contacted a financial advisor to counsel him on creating an Employee Stock Ownership Plan ("ESOP") for MMC where he, as a company manager, could receive preference to acquire ownership of the Company.  Nader undertook this move without the Board's knowledge or approval.

112.    In February 2022, Nader spent $50,000 in MMC funds to formally engage PCE Investment Bankers so that it could help him structure an "ESOP Transaction" for MMC. Nader's agreement with PCE was purported to be "exclusive," and thus in conflict with the Board's already in place agreement with another investment banking company.  The Board did not approve and was never informed of this engagement.

113.    The MMC Board later received two substantial offers for the sale of MMC through the efforts of its authorized investment banking company.  These were the highest and best bids the Board had received to date.

114.    The Board intended to accept one of the offers and enter an agreement to sell MMC.

115.    When Nader learned of these offers and the Board's intention to accept one of them, he promptly moved to sabotage the offers.

116.     For both offers, Nader leaked details about the buyers and disparaged the potential sales to MMC management, loan officers, and employees to promote his plan and stoke hostility towards other potential buyers.

117.     Nader also refused to meaningfully engage with the potential buyers as MMC's CEO.

118.     He even refused personal invitations to meet one on one with the CEO of one of the potential buyers.

119.     During the time that Nader knew the Company was seeking to identify a potential acquiror, Nader worked to ensure his position in the Company by signing employment contracts with loan officers that provided that, if Nader were no longer employed by MMC, the loan officers could also leave the Company without paying back their signing bonuses.

120.     So far, Nader's employment agreements with these loan officers have cost MMC more than $33,000 of the $2 million in impacted signing bonuses.

121.     As a result of Nader's actions, both potential deals fell through, leaving Nader's below market offer as the last remaining offer presented.

### *MMC Terminated Nader's Employment Once It Learned Of His Self-Dealing*

122.     Once MMC learned that Nader had failed to cooperate with, and even undertook to sabotage, the sale process, MMC ceased negotiations over his employment agreement.

123.     Nevertheless, in August 2022, Nader sought to restart negotiations over his proposed employment agreement with MMC by submitting his own markup of one of the draft employment agreement term sheets to the MMC Board.

124.   His markup included many new provisions that benefited Nader, including giving Nader veto power over potential sales of MMC, prohibiting non-competition covenants from binding Nader, and narrowly defining any "termination for cause."

125.   Around this same time, and based on Nader's conduct related to the sale of the Company, the Board undertook a thorough investigation into Nader's conduct as CEO of MMC.

126.   During the investigation, the Board discovered, among other self-dealing activities, that Nader had used company funds to finance a purchase of MMC shares, had taken out lines of credit in MMC's name to finance VTE's operations, and contacted third parties in order to purchase MMC for himself.

127.   Once the Board confirmed Nader's severe misconduct, the Board had no choice but to immediately terminate Nader's employment as CEO on August 15, 2022.

### Nader's Misconduct Has Caused MMC Serious Harm

128.   Nader's self-dealing and breaches of his fiduciary duties have caused – and continue to cause – MMC substantial and serious harm.

129.   He misused corporate funds in an effort to acquire interests in MMC.

130.   He misused corporate funds to form and fund the operation of VTE, a business in which he held a substantial ownership interest.

131.   He further harmed MMC and its shareholders by sabotaging the sale of the Company and forcing the Company to change CEOs in the midst of a very challenging mortgage market.

132.   As a result of all of his misconduct, Nader has caused direct and substantial financial harm to MMC in the form of misused corporate assets, lost sale proceeds, and harm to MMC's financial and competitive position.

## CAUSES OF ACTION

### COUNT I
### (Breach Of Fiduciary Duties)

133.    MMC realleges and incorporates by reference the allegations set forth in
Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

134.    As a corporate officer of MMC, Nader owed MMC fiduciary duties, including the
duties of loyalty, care, and good faith.  *See WLR Foods, Inc. v. Tyson Foods, Inc.*, 869 F. Supp.
419, 421 (W.D. Va. 1994), *aff'd,* 65 F.3d 1172 (4th Cir. 1995).

135.    He was thus obligated to discharge his duties "in accordance with his good faith
business judgment of the best interests of the corporation."  Va. Code Ann. § 13.1-690.

136.    As such, in his role as CEO, Nader could not put his personal interests ahead of
those of the corporation.  *See Rowland v. Kable*, 174 Va. 343, 366 (Va. 1940).

137.    Despite these clear and fundamental fiduciary obligations, during his tenure as
CEO Nader repeatedly and flagrantly breached them in multiple respects through brazen self-
dealing and self-interested transactions.

138.    Nader misrepresented to MMC's minority shareholders and the Board that he was
purchasing a minority shareholder's equity back into the MMC Treasury Fund, when in reality
he used unauthorized "loans" from MMC to purchase shares for himself.

139.    In doing so, Nader robbed MMC of its opportunity to repurchase the shares of its
minority shareholders.

140.    Nader further misappropriated MMC's assets to fund his purchases of MMC
equity.

141.    Nader also misappropriated corporate assets by using MMC capital to form and
fund another entity, VTE.  He opened and funded bank accounts, took out credit lines, purchased

other title companies, and created marketing materials and a website for VTE – all with MMC funds.

142.     Nader was not authorized to use corporate funds for these purposes, nor did he ever inform the Board of these uses of corporate funds.

143.     Nader also attempted to deprive MMC and its shareholders of any benefits of funding VTE.  Once he established VTE, Nader intended to restructure VTE's ownership structure to ensure MMC did not obtain majority control of the company through which it could have managed and benefitted from the company that it had funded.

144.     Nader also breached his fiduciary duties owed to MMC by failing to cooperate in and actively sabotaging the sale of MMC.

145.     When MMC received and intended to accept an offer to sell the Company, Nader, who wanted to acquire the Company for himself, sabotaged the offer by leaking details about the buyer to MMC employees to incite hostility towards the buyers and the sale.

146.     As a result, the deal fell through, and MMC lost the opportunity to sell its assets to the highest and best bidder and thereby obtain the best financial benefit for the Company and its shareholders.

147.     Nader further breached his fiduciary duties by entering into agreements on terms unfavorable to MMC in an attempt to shore up his position at the Company and line his own pockets.

148.     In particular, Nader agreed to employment contracts that allowed certain loan officers to leave the Company without paying back their signing bonuses if Nader were no longer employed at MMC.  These contracts alone have cost the Company $33,000 in damages so far, and may cost the Company up to $2 million.

149.    Nader also agreed to lease terms, including those with VTE, that were not in the best interest of MMC.

150.    Nader further entered into agreements contingent upon him remaining in control of MMC, threatening that MMC's operations would be defunded if he were no longer with the Company.

151.    Nader repeatedly and wrongfully disregarded MMC's best interests in favor of enriching himself at the Company's expense, including by misappropriating corporate assets and co-opting MMC's business opportunities for himself.

152.    Nader's misconduct undermined the sale of MMC, thereby depriving the Company and its shareholders of substantial value.

153.    Because Nader disregarded the interests of MMC and violated his duty to act in good faith to MMC's detriment, his transactions are voidable, including but not limited to his acquisition of Karen Lewis's stock.

154.    MMC is entitled to damages to compensate it for the harms that Nader has caused to the Company, as well as its attorney's fees and costs.

155.    MMC is further entitled to declaratory relief, as well as all other available remedies and relief, as set forth in its Prayer for Relief.

## COUNT II
### (Unjust Enrichment)

156.     MMC realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

157.    MMC has provided Nader with compensation in exchange for Nader executing the duties as CEO of MMC in good faith and operating MMC's day-to-day operations in furtherance of MMC's best interests.

158.    Nader's compensation included MMC paying him a substantial salary and large performance-based and good faith bonuses.

159.    Until August 15, 2022, MMC continued to pay Nader his agreed-upon salary and benefits.

160.    Nader knows of the benefits that MMC has conferred on him through his MMC compensation package.

161.    Nader has further acquired MMC stock through the use of MMC corporate funds without authorization from the MMC Board.

162.    Nader has further benefited financially from his ownership in VTE, which was funded by MMC without authorization from the Board of MMC.

163.    Nader is aware of the benefit he has retained through his improper acquisition of MMC stock and through VTE.

164.    It would be inequitable and unjust for Nader to retain the benefits of MMC's compensation, bonuses, and stock.

165.    The MMC Board paid Nader for his services as CEO of MMC and expected Nader to perform his executive role as a fiduciary and in good faith and for the benefit of MMC in return for that compensation.

166.    Nader failed to perform the services for which he was compensated by MMC.

167.    He further acquired MMC stock without paying for it with his own funds, and has personally benefited from a company he founded and funded with MMC dollars.

168.    MMC has been harmed by Nader's failure to pay MMC for the acquisition of MMC equity shares, by Nader's decisions to fund VTE through MMC accounts, and by Nader's failure to perform his job obligations in exchange for his compensation package.

169.     MMC is entitled to damages, including but not limited to the value of Nader's executive compensation, the value of the bonuses MMC paid him in good faith, the value of MMC's contributions to VTE, and any value or gain he received from VTE.

170.     MMC is further entitled to declaratory relief, as well as all other available remedies and relief, as set forth in its Prayer for Relief.

### COUNT III
**(Conversion)**

171.     MMC realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

172.     MMC is the rightful owner of MMC's property, including but not limited to its cash and other assets.

173.     Nader wrongfully exercised dominion and control over MMC's property, including but not limited to its cash and other assets.

174.     Nader personally acquired MMC stock using MMC funds, without the knowledge and approval of MMC's Board.

175.     Nader used MMC funds to create and fund VTE, including using MMC funds to establish bank accounts, procure credit lines, and purchase other title companies and marketing materials for VTE, again without Board knowledge or approval.

176.     MMC is entitled to damages, including but not limited to the fair market value of the shares Nader improperly acquired and the value of MMC's contributions to VTE.

177.     MMC is further entitled to declaratory relief, as well as all other available remedies and relief, as set forth in its Prayer for Relief.

## COUNT IV
**(Fraud)**

178.    MMC realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

179.    Nader represented to the Board of MMC that Karen Lewis's stock shares would be purchased back into MMC's Treasury Fund.

180.    Nader's representation was material because it caused the Board not to question the purchase or the use of company funds to make the purchase.

181.    Nader intended his false representation to mislead the Board, and indeed the Board relied on Nader's false representation and did not immediately challenge the transaction.

182.    Nader's material representation was false and misleading.  Rather than returning the shares to MMC's Treasury Fund, Nader used MMC funds to purchase Karen Lewis's shares and then transferred the shares to himself.

183.    Nader's misrepresentations have harmed MMC.  MMC was deprived of the funds Nader used to purchase the stock, as well as the stock itself.

184.    MMC is entitled to damages and declaratory relief, as well as all other available remedies and relief, as set forth in its Prayer for Relief.

## COUNT V
**(Declaratory Judgment Pursuant To 28 U.S.C. § 2201)**

185.    MMC realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 132 of this Complaint as if fully set forth herein.

186.    An actual and justiciable controversy exists concerning whether Nader has breached his fiduciary duties to MMC by misappropriating corporate assets, sabotaging MMC business opportunities, and engaging in various schemes to acquire MMC for himself.

187.    MMC asserts that Nader's misconduct has substantially harmed MMC's business interests and financial position, while Nader disputes as much.

188.    An actual and justiciable controversy also exists concerning whether Nader was properly terminated from his employment at MMC.

189.    Nader disputes that he was properly terminated by the Board for his conduct and asserts that he is still owed a bonus from MMC under his informal agreement with the Company.

190.    Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, MMC demands a trial by jury in this action on all issues so triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, MMC prays for this Court to enter judgment against Nader, granting the following relief:

1.    A declaration that:

- Nader breached his fiduciary duties to MMC by acquiring MMC equity shares without the MMC Board's authorization;

- Nader breached his fiduciary duties to MMC by improperly acquiring MMC equity shares through the use of MMC corporate assets;

- Nader breached his fiduciary duties to MMC by creating and funding VTE with MMC monies without the MMC Board's knowledge or authorization;

- Nader breached fiduciary duties to MMC by attempting to divest MMC of its equity and voting power in VTE;

- Nader breached his fiduciary duties to MMC by sabotaging MMC's sale in an attempt to acquire the Company for himself at a price well below the fair market price of the Company;

- Nader breached his fiduciary duties to MMC by entering into employment, lease, and finance agreements that were not in the best interests of the Company;

- Nader's acquisition of Karen Lewis's stock shares is void;

- Nader has been unjustly enriched by failing to compensate MMC for its valuable equity shares that have benefitted Nader;

- Nader has been unjustly enriched by accepting and retaining his executive salary and bonuses from MMC for services he did not perform;

- Nader has been unjustly enriched by benefiting financially from VTE, which was funded by MMC without authorization from the Board of MMC;

- Nader converted MMC funds by personally acquiring MMC stock using MMC funds, without the knowledge and approval of MMC's Board;

- Nader converted MMC funds by using MMC funds to create and fund VTE, including using MMC funds to establish bank accounts, credit lines, and marketing materials and purchase other title companies for VTE, without Board knowledge or approval;

- Nader committed fraud by falsely representing to the Board of MMC that Karen Lewis's stock shares would be purchased back into MMC's Treasury Fund, when in fact Nader used MMC funds to purchase the stock for himself; and

- Nader was properly terminated from his employment at MMC.

2. An order requiring Nader to return Karen Lewis's MMC shares to the MMC Treasury Fund;

3. An order requiring Nader to turn over VTE equity to MMC and pay MMC any amounts he received from VTE;

4. Actual damages in an amount according to proof, including but not limited to all damages associated with the lost sale of MMC, all damages associated with Nader's termination, and all damages related to bonuses MMC cannot claw back from loan officers who left MMC after it terminated Nader;

5. Costs of suit herein, as permitted by law;

6. Attorney's fees, as permitted by law;

7. Pre-judgment, post-judgment, and other interest on all monetary damages, as permitted by law; and

8.      Any and all such further relief that the Court deems just and proper.


Dated: September 7, 2022


By:  _____

Paul Werner, Bar No. 48910
Imad Matini, Bar No. 90126
Maria-Laura Coltre, Bar No. 92177
Eric Schlichter (*pro hac vice* to be filed)
Hannah Wigger (*pro hac vice* to be filed)
Kathryn Ryan (*pro hac vice* to be filed)

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1900
Facsimile: 202-747-1901
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
mcoltre@sheppardmullin.com
eschlichter@sheppardmullin.com
hwigger@sheppardmullin.com
katryan@sheppardmullin.com.

*Attorneys for Plaintiff MMC*